**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
————————————————————————

**JENNIFER GILBERT,**

                                        **Plaintiff,**

        **-against-**                                        **3:09-CV-754 (TJM/DEP)**

**VILLAGE OF COOPERSTOWN, NEW YORK;**
**VILLAGE OF COOPERSTOWN POLICE DEPARTMENT;**
**CHIEF OF POLICE DIANA NICHOLS; SERGEANT**
**FASSETT; JOHN DOE(S) and JANE DOE(S),**

                                        **Defendants.**
————————————————————————

**THOMAS J. McAVOY,**
**Senior United States District Judge**

**DECISION & ORDER**

**I.      INTRODUCTION**

        Plaintiff commenced this action asserting claims pursuant to Title VII of the Civil

Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("Human Rights

Law"), 42 U.S.C. § 1983 ("Section 1983"), and New York state common law.   Defendants

move for summary judgment seeking to dismiss some of Plaintiff's claims.  Plaintiff

opposes the motion and cross-moves to amend her complaint.  For the reasons that

follow, Defendants' motion is granted in part and denied in part, and Plaintiff's cross-

motion is granted.

1

## II.   STANDARD OF REVIEW

The Court will apply the well-settled standards for deciding summary judgment

motions in Title VII and other discrimination actions.  See Fed. R. Civ. P. 56(c); Weinstock

v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000); Patterson v. County of Oneida, 375

F.3d 206, 225 (2d Cir. 2004)(§ 1983); Bracci v. N.Y.S. Dept. of Correctional Services,

2005 WL 2437029, at * 1 (N.D.N.Y. Sept. 30, 2005) (McAvoy, S.J.).

## III.   BACKGROUND[1]

### a.   Appointment

On June 19, 2007, Plaintiff received a one-year provisional appointment as a police

officer for the Village of Cooperstown Police Department ("Department").  Plaintiff was

deemed a probationary appointee until June 29, 2008.  She was aware that permanent

employment was conditioned on successful completion of the one year probationary term,

including successful completion of a Basic Course for Police Officers (the "Police

Academy").

### b.   Plaintiff's Performance

Defendants contend that Plaintiff's performance as a probationary officer was

substandard in the areas of following the chain of command and obeying orders, asserting

that Plaintiff often talked back to her superior officers, questioned their judgment, and

argued with them over many issues including whether to follow direct orders.  Plaintiff

---

[1]Unless indicated otherwise, the Court takes the facts from the parties' Local Rule 7.1(a)(3) Statements. All facts are viewed in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 127 S. Ct. 1769, 1776 (2007).  The Court reminds the parties that  L.R. 7.1(a)(3) "denials" that are not based on personal knowledge or not supported by admissible evidence in the record are insufficient to rebut properly supported facts.

counters that her supervisor, Sergeant Mark Fassett, often instructed her not to follow the orders given by Chief of Police Diana Nichols, and that Sgt. Fassett instructed her not to communicate directly with Chief Nichols.  There is no dispute, however, that on January 26, 2008, Plaintiff sent an email to Sgt. Fassett stating:

> [A]fter your counseling with me Friday night I took a great deal of time to think about and research my problems/solutions.  It is hard to fix a problem when you don't know what the real problem is.  I am sorry for being mouthy. I am going to try my best to reform and look at my position with fresh educated eyes.  I think I might understand the issues now, I really did not understand paramilitary . . . it will take me some time and I'm sure a slip up here and there (ha, ha) but you will see a change starting now!
>
> Thanks,
>
> Your Rookie

Def. Ex T (ellipsis in original).

Thereafter, Chief Nichols completed an employee evaluation stating that a "new understanding of chain of command [by Plaintiff] is becoming evident."  Chief Nichols concluded that Plaintiff would make an excellent officer.

### c.    Sexual Harassment/Hostile Work Environment

Plaintiff alleges that during her employment, Fassett subjected her to an on-going course of sexual harassment and created a hostile work environment.  The conduct, which began in August 2007, included unwanted sex-based statements and comments to Plaintiff.  See Gilbert Aff. ¶¶ 5-10.  According to Plaintiff, Fassett would regularly discuss his own sexual relationships and make comments about Plaintiff's anatomy and appearance.  Id.

Fassett admits that shortly after Plaintiff began at the Department, he told her that

he was engaged in a twelve (12) year sexual affair with his best friend's wife.  Fassett

7/21/10 Dep., pp. 58-63, 69.  Fassett asserts that he told Plaintiff this information, as well

as other fictitious information, as a management test.  Id.; Fassett 7/23/10 Dep., pp. 8- 9.[2]

There is a dispute as to when and in what manner Plaintiff reported Fassett's

conduct to the employer.  At Plaintiff's Rule 50(h) hearing and in response to the question

of whether Plaintiff reported Fassett's conduct to Chief Nichols, Plaintiff testified that in

March 2008 she asked to talk to Nichols because she did not know what to do about

Fassett's sex-based comments.  Gilbert 50(h) Trans., pp. 78, 82.   She and Chief Nichols

then walked around Cooperstown for "almost two hours" during which Plaintiff "poured

[her] heart out about everything that was going on" with Sgt. Fassett.  Id. p. 78.

The timing of this first disclosure is consistent with Plaintiff's latter testimony. When

asked at her deposition when she first spoke to Chief Nichols about Sgt. Fassett's course

of inappropriate comments, Plaintiff responded that she did not recall or could not

remember. Gilbert Dep. pp. 132-133.  When pressed on this issue, Plaintiff testified that

she had spoken to the Chief about Sgt. Fassett's "overall" conduct on several occasions

while she was employed in the Department, id. p. 133,[3] but that the "first time that [she]

put everything out on the table for [Chief Nichols] to know" was "slightly before the

---

[2]There is no further elaboration in the portions of the depositions cited by Plaintiff as to how the information was used as a management test.

[3]From the substance of Plaintiff's affidavit, it appears that the earlier conversations with Nichols concerned the manner that Fassett and the other male officers in the Department dealt with Plaintiff, not the sex-based substance of Fassett's statements.  See e.g. Gilbert Aff., ¶ 12 ("Chief Nicols stated that I was 'intimidating' because I was a 'smart and intelligent woman'. She stated in sum and substance that I needed to act dumb around the male officers so that I did not intimidate them. She stated 'it must be confusing for you' because 'sometimes they want you to be the rookie and other times they want you to be a regular cop'. She also told me 'if he's wrong, let him be wrong', referring to Sgt. Fassett.  She stated, 'when you correct him, it makes him mad'.")

4

Academy" in April 2008.  Id. p. 133.  Plaintiff also asserts in her affidavit that "[t]owards the end of February or beginning of March, 2008, I had a lengthy talk with Chief Nichols and told her what had been going on with Sgt. Fassett and his sexual comments and behavior." Gilbert Aff. ¶ 14.[4]  Thus, Plaintiff's testimony is consistent that her first disclosure of Fassett's course of conduct occurred in March 2008 during a walk with Chief Nichols.

During this walk, Nichols purportedly responded to what Plaintiff told her by repeatedly stating: "'NFW', which is short for 'no fuckin way.'"  Id.; see also Gilbert 50(h) Trans., p. 78 (testify to the same responses from Nichols).  Plaintiff also told Nichols during the walk:

> I'm telling you because I'm going to try to do something about it. . . . I'm going to try to handle it.  The next time he makes a comment, I'm going to stand up for myself and make it stop.  I just want you to know because of the whole sergeant/rookie thing.

Gilbert 50(h) Trans., pp. 79-80.  Chief Nichols responded: "Okay, just keep me posted." Id. p. 80.  Plaintiff interpreted Nichol's response as giving Plaintiff "an opportunity to fix" the situation herself.  Id. p. 82; but see Gilbert Aff. ¶ 14.[5]

The next day Fassett made a comment to Plaintiff about the size of her breasts.  Id.

---

[4]Plaintiff also asserts in ¶ 14 of her affidavit that "I had previously reported to [Nichols] his comments but she was always very dismissive, suggesting it wasn't a big deal."  To the extent this assertion contradicts the earlier testimony referenced in the text, the assertion is disregarded on this motion. See Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 104 (2d Cir. 2010)("We have held that a party cannot create an issue of fact by submitting an affidavit in opposition to summary judgment that contradicts prior deposition testimony.")(citations omitted).

[5]In her affidavit, Plaintiff asserts that in response to her disclosure of Fassett's conduct, Chief Nichols stated repeatedly "NFW" and then merely told Plaintiff to "try to resolve it yourself."  Gilbert Aff. ¶ 14. There is no mention that Plaintiff told Nichols that she wanted to work out the situation herself as she testified earlier. To the extent the affidavit conflicts her prior testimony, the affidavit is disregarded on this motion. Gorzynski , 596 F.3d at 104.

p. 80.  Plaintiff told Fassett: "I'm not taking these comments from you anymore.  This is a professional business and you will treat me as a professional equal."  Id.  Plaintiff then went to Chief Nichols and told her what she had said to Fassett.  Id.  Chief Nichols separated Plaintiff and Fassett from working together because, according to Plaintiff, "we could not work together anymore because of how bad this had gotten."  Id. p. 81.

Even though they were not working together, Fassett tried to speak to Plaintiff and, when she refused, he "wrote [her] up" and ordered Plaintiff not to speak to the Chief anymore.  Id.   A few days later,

> both Chief Nichols and Sgt. Fassett ordered me into the Chief's office. Sgt. Fassett stated that he could get "rid" of me even after I started the Academy. Chief Nichols agreed and stated that "if your sergeant tells you it's night but it's day, it's actually night". The Chief obviously told him what I said and they were very intimidating and hostile to me. They cornered me and would not let me leave. Sergeant Fassett blocked the door. He first stood in front of it then took a chair and sat down still blocking the door. The Chief similarly positioned herself so that I could not leave. They verbally attacked me and accused me of sabotage of fellow officers.

Gilbert Aff. ¶ 15.

Chief Nichols contends that the first and only time that she received a complaint from Plaintiff regarding a sex-based statement by Fassett occurred in October or November of 2007.  See Nichols Dep. pp. 33-37.  According to Nichols, both Plaintiff and Fassett independently reported to her an incident that occurred while Plaintiff was trying on a uniform shirt that had belonged to a woman who had left the Department.  There is a dispute as to the actual colloquy that took place between Plaintiff and Fassett[6] but, based

---

[6]Chief Nichols asserts that both indicated similar accounts of what had been said.  Nichols Dep. pp. 33-38. According to the account related to Nichols, while Plaintiff was trying the shirt on over the shirt that she was wearing, she said something to the effect that she did not think the shirt would fit. Id.  Although

on what was reported to Nichols, Fassett made a statement to the effect that Nichol's breasts were larger than Plaintiff's breasts.  Id.  Plaintiff purportedly told Nichols not to investigate the comment and that Plaintiff would take care of it.  Id.  Despite Plaintiff's desire for Nichols to take no action, Nichols reported the comments to Village of Cooperstown Personnel Director, Mary Ann Henderson. Id. pp. 37-41.  Henderson purportedly told Nichols that it probably "wasn't a big issue" but that Nichols should "work to keep the two of them separated more than [] had been" done up to that point. Id. p. 41.[7] Nichols also contends that she interviewed three officers to determine if they observed Fassett acting inappropriately towards Plaintiff. Id. pp. 149-50.[8]  Although none of the officers advised Nichols that they observed Fassett acting inappropriately towards Plaintiff, Nichols scheduled Plaintiff and Fassett to different shifts, limited their contact as much as possible in the Department, and directed Fassett not to engage in anymore conversations of that nature. Id. pp. 41, 149-50, 162-63.

### d.    Disparate Treatment - Terms and Conditions of Employment

Plaintiff contends that she was required to perform more administrative duties than male officers, that Fassett would yell at her and another female officer in the Department

---

Plaintiff disputes it, she is alleged to have said that she thought that the woman whose shirt she was trying on had "bigger boobs" than she did. Id.  Fassett responded to Plaintiff:  "Well, the Chief's got you both beat." Plaintiff then said: "Stop talking about my boobs."  Id.

[7]Nichols testified that she had been trying to keep the two separated as much as possible already because they had trouble working together, although the trouble was not "sexual harassment related" but because Plaintiff had difficulties following the chain of command as Fassett required.  Nichols Dep. pp. 41-42.

[8]Plaintiff denies this assertion on the grounds that there are no notes or documents that memorialize these interviews.

at the time, Lori Mearz, while refraining from yelling at male officers, and that Fassett prevented her and Mearz from speaking with the Chief while not imposing a similar restriction on male officers.  Fassett denies that he treated Plaintiff or Mearz in a disparate fashion from male officers, and contends that Plaintiff performed the administrative duties that she requested to perform (preparing Uniform Crime Reports) and that male officers performed these duties before and after Plaintiff worked in the Department.  See Fassett Aff. ¶¶ 3-5.

Mearz, who is no longer employed in the Department, does not recall whether male officers were required to perform the same type or amount of clerical duties that she and Plaintiff were required to perform. Mearz Dep., pp. 24-25.  As to Fassett's yelling, Mearz remembered only one instance when Fassett treated her in a hostile or disrespectful manner (which occurred when she was a rookie officer and "second guessed" Fassett), and did not remember whether Fassett treated male officers in similar fashion or whether he treated Plaintiff differently than male officers.  Id. pp. 62-63.  Mearz characterized Fassett's position regarding conversations with the Chief as his insistence that officers follow the proper chain of command, but also noted that the Chief had an "open door policy" so the paramilitary-style chain of command requirements were not followed in the Department.  Id. pp. 38-39.

### e.    The Police Academy

Chief Nichols scheduled Plaintiff to attend the Otsego County Law Enforcement Academy on April 1, 2008.  The physical agility test for admittance into the Police Academy consisted of the cadet completing a requisite number of sit-ups, push-ups, and a

8

mile and one-half run.  Plaintiff had broken her ribs the February before the Police Academy so she made a special effort to prepare for the agility test including hiring a personal trainer.  The Chief also assisted Plaintiff in preparing for the physical fitness test by, on at least one occasion, going with Plaintiff to a local track to practice for the running portion of the exam.

Nevertheless, Plaintiff failed the running portion of the test at the Police Academy.  Plaintiff was upset and contacted the Chief after she failed the test.  The Chief invited Plaintiff to her home to have a glass of wine and to calm down.  Another provisional appointee from the Department, Officer Cox, also failed the agility test at the Police Academy.  The following day, Nichols contacted the Police Academy and inquired if Plaintiff and Officer Cox could retake the agility test but her request was denied.  The Chief was advised that the Police Academy had adopted guidelines that year that prohibited cadets from retaking the physical agility test.  Because candidates could not retake the test, Plaintiff and Cox were disqualified from attending the Police Academy that year.

Chief Nichols asserts that she made an exception to her normal policy of not permitting her officers to attend an outside academy and contacted three or four alternative academies for available space for Plaintiff because she was nearing the end of her probationary period. Nichols contends that she could not locate an academy that could accommodate Plaintiff.  Plaintiff alleges, however, that she located two available academies that she could attend that summer and even offered to pay her own tuition, but that Nichols refused to allow her to attend these academies.

9

### f.      Termination of Employment

Defendants assert that because the next Otsego County Police Academy that Plaintiff could attend would not begin until almost a year after Plaintiff's one-year provisional appointment ended, and because the Department risked potential liability by keeping an officer on duty who had not completed the Police Academy within the one year provisional appointment period as required by New York General Municipal Law § 209-q,[9] the Chief recommended to the Personnel Director, Mary Ann Henderson, that Plaintiff forfeit her position with the Department.  The Village of Cooperstown Board of Trustees subsequently voted in favor of requesting Plaintiff's resignation.  On April 8, 2008, Plaintiff received a letter advising her that she must forfeit her position with the Village of Cooperstown because she was unable to meet the requirements of General Municipal Law § 209-q.

Plaintiff contends, however, that the custom in the Department was to extend provisional police officer appointments to allow completion of the Police Academy beyond the one-year limitation period by obtaining a waiver from the New York State Department of Criminal Justice Services.  Plaintiff points to other Village officers whose provisional appointments were extended to allow completion of the Police Academy beyond one year from their appointments, and maintains that the real reason why Nichols recommended that she be terminated was because she had complained about sexual harassment by Fassett.

---

[9]Section 209-q(1)(a) of the New York General Municipal Law requires that all persons seeking permanent appointment as a municipal Police Officer complete a Municipal Police Training Council (MPTC) approved Police Academy.  Section 209-q(1)(a) and 9 NYCRR 6020.7(a) and (b) provide that all officers must complete the basic training within one year of their provisional appointment or forfeit their position.

<u>**g.**</u>    <u>**Bassett Healthcare Employment**</u>

After Plaintiff was terminated, she applied for a job in the security department at Bassett Hospital.  On June 30, 2008, Bassett Hospital made Plaintiff an offer for the security position conditioned on a positive reference check.  Commercial Investigations LLC conducts reference and background checks on applicants at Bassett Hospital.  A representative from Commercial Investigations LLC checked with one of Plaintiff's former professors who gave Plaintiff high ratings on issues such as character and attitude.  When Chief Nichols was contacted, however, she advised that she was unable to provide a reference or comment due to Department policy that prohibited references or comment on former employees.

During the regular hiring process, Joe Middleton, Vice President of Corporate Support Services and Facilities Planning at Bassett Hospital, was advised that Gilbert had been offered the security position conditioned on a positive reference check.  While in local bar, Middleton had overheard a conversation to the effect that Gilbert had trouble at her previous job with the Police Department, that she had difficulties getting along with others at work, and that she had engaged in sexual conduct with a co-worker.[10]  Middleton contacted Chief Nichols, who he had known since Nichols was a child, and asked what she could tell him about Plaintiff.   Nichols responded that it was against Village policy to discuss employment matters.  Middleton interpreted the comment to mean that there was something that Nichols could not or would not tell him.  A few days latter, Middleton

---

[10]Middleton was familiar with the police officers from the Department and testified that the comments he overheard in the bar were not made by Department police officers.

contacted Chief Nichols again.  This time he was "more aggressive" in asking what Nichols could tell him about Plaintiff.  Middleton Dep., p. 27.  Nichols was "initially resistant and then after some additional conversations, she told [him], she says 'well, I wouldn't hire her.'"  Id.  Middleton then contacted the Human Resource Department at Bassett Hospital and gave instructions not to hire Plaintiff.   In doing so, he stated in an email that he had spoken to Chief Nichols and that Nichols had stated that "Jennifer is aware that her performance was not up to standards and recommended that we not hire her."  Bassett Hospital then rescinded its offer to Plaintiff.  At the time Middleton gave the instruction not to hire Plaintiff, he was unaware that Plaintiff had made a complaint of sexual harassment at work.  Id. p. 30.  Middleton attests that he made the decision not to hire Plaintiff after the first conversation with Chief Nichols and he contacted Nichols the second time merely to verify his suspicion that she would not recommend Plaintiff for employment.  Id. pp. 59-60.

## VI.    DISCUSSION

### a.    Police Department as Defendant

Plaintiff concedes that the Village of Cooperstown Police Department is part of the Village of Cooperstown municipal corporation and that the alleged actions of police department personnel may be imputed to the Village of Cooperstown.  Accordingly, there is no basis to maintain the Police Department as an independent defendant.  See Orraca v. City of N.Y., 897 F. Supp. 148 (S.D.N.Y. 1995); Wilson v. City of N.Y., 800 F. Supp. 1098, 1101 (E.D.N.Y. 1992), aff'd, 32 F.3d 989 (2nd Cir. 1994).  Therefore, all claims against the Village of Cooperstown Police Department are dismissed.

### b.    Title VII Claims against Individual Defendants

Plaintiff also concedes that, in the Second Circuit, a party may not maintain Title VII claims against an individual who is not the employer.  See Wrighten v. Glowski, 232 F.3d 119 (2d Cir. 2000).  Accordingly, all Title VII claims against Defendants Diana Nichols and Sgt. Fassett are dismissed.

### c.    Doe Defendants

Plaintiff has not identified or served the "Doe" defendants and discovery has closed.  Accordingly, all claims against the Doe defendants are dismissed.

### d.    Sexual Harassment / Hostile Work Environment Discrimination - Title VII & Human Rights Law

In order to establish an actionable hostile work environment claim, Plaintiff must demonstrate that (1) she "subjectively perceive[d] the environment to be abusive;" (2) the conduct alleged objectively created "an environment that a reasonable person would find hostile or abusive;" and (3) that the "work environment [was] abusive to employees because of their . . .  gender . . . ." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993). Plaintiff must also "show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 723-24 (2d Cir. 2010).  The New York courts "require the same standard of proof for claims brought under section 296 of the Human Rights Law as for those brought under Title VII," Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d Cir. 1998), including sexual harassment hostile work environment claims. See EEOC v. Rotary Corp., 297 F.

13

Supp.2d 643, 661 (N.D.N.Y. 2003); Barnum v. New York City Transit Authority, 878 N.Y.S.2d 454, 455 (2nd Dept. 2009).

Accepting Plaintiff's allegations of almost constant sex-based statements by her supervisor, Sgt. Fassett, she has submitted sufficient evidence to establish both the subjective and objective pervasiveness elements of such a claim.  See Patterson v. County of Oneida, 375 F.3d 206, 227 (2d Cir. 2004); Byra-Grzegorczyk v. BristolMyers Squibb Co., 2008 WL 3870692, at * 9  (D. Conn. Aug. 20, 2008).   Further, given the nature of the alleged comments a fact finder could conclude that Fassett's conduct was motivated by Plaintiff's gender.  Alfano v. Castello, 294 F.3d 365, 374 (2d Cir. 2004); Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001).  Thus, Plaintiff has established a *prima facie* case of a gender-based hostile work environment on this motion.

"Beyond demonstrating a hostile work environment, a plaintiff must show a basis for imputing the objectionable conduct to the employer.  When, as here, the alleged harasser is in a supervisory position over the plaintiff, the objectionable conduct is automatically imputed to the employer."  Gorzynski v. Jetblue Airways Corp., 596 F. 3d 93, 103 (2d Cir. 2010)(citations omitted).  Defendants contend, however, that they are entitled to summary judgment dismissing the sexual harassment claims based upon the Faragher/Ellerth affirmative defense. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); see also Edrisse v. Marriott Intern., Inc., --- F. Supp.2d ----, 2010 WL 5174345, at * 3 (S.D.N.Y. Dec. 13,

2010);[11] Barnum, 878 N.Y.S.2d at 455-56.[12]

> In Faragher and Ellerth, the Supreme Court held that an employer is not liable under Title VII for sexual harassment committed by a supervisory employee if it sustains the burden of proving that (1) no tangible employment action "such as discharge, demotion, or undesirable reassignment" was taken as part of the alleged harassment, [Ellerth, 524 U.S. at 765, 118 S. Ct. 2257,] (2) "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," [Faragher, 524 U.S. at 807, 118 S. Ct. 2275,] and (3) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise[, id.]"

Zakrzewska v. The New School, 574 F.3d 24, 26 (2d Cir. 2009)(quoting Zakrzewska v.

The New School, 598 F. Supp.2d 426, 432 (S.D.N.Y.2009)).

Plaintiff's termination was effectuated by the Village Board on the recommendation

of Chief Nichols.  Nichols recommended Plaintiff's termination because Plaintiff failed to

complete the Police Academy within one year of her provisional appointment.  While a

fact finder could conclude that Nichols' recommendation was in retaliation for Plaintiff's

complaint of sexual harassment (discussed *infra*), there is insufficient evidence supporting

the proposition that Fassett caused the termination as a means to harass Plaintiff. See

Gorzynski, 596 F.3d at 103 n. 3.  "It is not enough that the supervisor who created the

alleged hostile work environment played a role in the employment action." Edrisse v.

Marriott Intern., Inc., --- F. Supp.2d ----, 2010 WL 5174345, at * 3 (S.D.N.Y. Dec. 13,

2010).  Rather, "[i]n order to avoid an employer's assertion of Faragher/Ellerth on this

---

[11] (Applying the Faragher/Ellerth defense to claims brought under the New York Human Rights Law)

[12] ("[U]nder Executive Law § 296, it is a defense to a claim of harassment arising from the conduct of a supervisory employee that the employer exercised reasonable care to prevent and correct promptly [the] discriminatory conduct ... and that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm.")(interior quotation marks and citations omitted)

basis, . . .  there must be a nexus between the employment action and the harassing

conduct at issue." Id. (citing Ferraro v. Kellwood Co., 440 F.3d 96, 101-02 (2d Cir. 2006)).

No such nexus exists in this case and, thus, Defendants have established the first prong

of the Faragher/Ellerth defense.

As to the second prong, there is no dispute that the Village of Cooperstown

maintains a formal, written sexual harassment policy that was contained in "the policy and

procedure book" maintained in the Department's office.  Gilbert Dep., p 79; Def. Ex. M.

This policy specifically states that it applies to "[s]exual harassment" and gives examples

of "prohibited sexual harassment" including "[v]erbal . . . sexually suggestive or obscene

comments" and "[co]nduct with sexual implications when such conduct interferes with the

employee's work performance or creates an intimidating environment." Def. Ex. M.  The

procedure for making a complaint under the policy is set out concisely, and requires an

aggrieved employee to make a complaint "to their supervisor" unless "this person is the

cause of the offending conduct" then the employee "may report this matter directly to the

Personnel and Finance Committee." Id.  The policy states that "[i]t is preferable to make a

complaint in writing, but you can accompany or follow up your written complaint with a

verbal complaint." Id.  The policy further provides that an investigation will be commenced

"within thirty (30) days after a written complaint is made."  Id.

Plaintiff acknowledges that she reviewed the policy shortly after she was appointed

to her position, and that she was aware that the policy was maintained in a three-ring

binder on a bookshelf in the Department's office. Gilbert Dep., p 79.  Plaintiff does not

argue the sexual harassment policy and complaint procedure are insufficient with respect

to the second element of the Faragher/Ellerth defense. Therefore, the second prong is

presumptively satisfied in Defendant's favor. See Gorzynski, 596 F.3d at 103; Ferraro v.

Kellwood Co., 440 F.3d 96, 102 (2d Cir. 2006).[13]

> However, an employer can still be held liable if the employee can show that
> it "knew, or should have known about the harassment yet failed to take
> remedial action." Duch v. Jakubek, 588 F.3d 757, 763 (2d Cir. 2009).
> Plaintiff must show that (1) an employee of the company has actual or
> constructive knowledge of the harassment, (2) this knowledge can be
> imputed to the employer, and (3) the employer's response was
> unreasonable. Id.

D'Angelo v. World Wrestling Entertainment, Inc., 2010 WL 4226479, at *7 ( D. Conn. Oct.

18, 2010).

Here, the first two elements can be satisfied in Plaintiff's favor.  However, the

uncontested facts are that under both complaint scenarios (comments made during the 2-

hour walk with a complaint the following day, or a complaint in relation to the "shirt

incident"), Nichols separated Plaintiff and Fassett's shifts even though, in both scenarios,

Plaintiff instructed Nichols to do nothing.  A reasonable fact finder would not conclude

that, in light of Plaintiff's instruction to Nichols to do nothing, the employer's response was

unreasonable.  Still further, there is no evidence that Fassett's sexually harassing conduct

continued after Plaintiff reported Fassett's breast comment the day after the 2-hour walk.

Inasmuch as Plaintiff asserts that the "first time that [she] put everything out on the table

for [Chief Nichols] to know" about Fassett's conduct was during the 2-hour walk but also

that she instructed Nichols to do nothing about the conduct, a reasonable fact finder could

---

[13]("An employer may demonstrate the exercise of reasonable care, required by the [second] element, by showing the existence of an antiharassment policy during the period of the plaintiff's employment, although that fact alone is not always dispositive." ).

not conclude that Nichols' response the following day (separating the two) was unreasonable under the circumstances. Thus, the second prong is satisfied in Defendant's favor.

The third prong requires the Village to demonstrate that Gilbert unreasonably failed to take advantage of the sexual harassment policy.  While Plaintiff did complain to "a supervisor" under the two scenarios mentioned above, the facts are undisputed that, under both scenarios, Plaintiff instructed Chief Nichols to do nothing about her complaint. Moreover, Plaintiff asserts that the sexual harassment began in August 2007 yet the first time she advised Chief Nichols of the on-going course of treatment was in March 2008.

By waiting almost seven months to report the conduct, by instructing Nichols to do nothing in response to her complaint, and by failing to file a written report (which would have activated the investigation procedure), a reasonable fact finder could only conclude that Plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise."  Ellerth, 524 U.S. at 765. Therefore, Defendant has satisfied the third prong of the Faragher/Ellerth defense. Accordingly, the Title VII and New York Human Rights Law hostile work environment/sexual harassment claims against the Village of Cooperstown are dismissed.[14]

_____

[14]The parties have not addressed whether there are viable N.Y. Exec. Law § 296(6) claims against the individual defendants.  See Lamere v. New York State Office for the Aging, 2005 WL 1174068, at * 15 (N.D.N.Y. April 27, 2005).  Absent argument, the Court refrains from addressing the viability of such claims.

<u>e.</u>      <u>**Disparate Treatment Discrimination**</u>

**1.  Terms and Conditions of Employment**

Plaintiff's allegations of gender based disparate treatment during the course of her employment are insufficient to survive the instant motion. "A plaintiff relying on disparate treatment evidence must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." <u>Mandell v. County of Suffolk</u>, 316 F.3d 368, 379 (2d Cir. 2003); <u>see</u> <u>Rosinski v. American Axle & Mfg., Inc.</u>, 2010 WL 3402984, at * 2 (2d Cir. Aug. 31, 2010)(same).  Plaintiff provides no concrete examples demonstrating that she was treated differently than a similarly situated male probationary officer with respect to administrative assignments or the way that she was spoken to by Fassett.  Rather, her "proof" of disparate treatment is based upon nothing more than Plaintiff's conclusory speculation that she was treated in a dissimilar fashion to the male officers in the Department.  However, Plaintiff's "feelings and perceptions of being discriminated against are not evidence of discrimination." <u>Bickerstaff v. Vassar College</u>, 196 F.3d 435, 456 (2d Cir. 1999)(citation omitted);  <u>see</u> <u>id.</u> at 448;[15] <u>Richardson v. New</u>

---

[15] As indicated in <u>Bickerstaff</u>, on a motion for summary judgment the Court:

> must also carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.   This undertaking is not one of guesswork or theorization.   After all, an inference is not a suspicion or a guess.   It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist. Thus, the question is whether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances.

<u>Bickerstaff</u>, 196 F.3d at 448 (internal quotation marks and citations omitted).

York State Dep't, of Correctional Service, 180 F.3d 426, 447 (2d Cir. 1999).[16]

The same holds true with regard to Plaintiff's claim that Fassett treated her in a discriminatory disparate fashion by instructing her not to speak directly to Chief Nichols. Moreover, as demonstrated by Plaintiff's conduct and Lori Mearz's testimony, Chief Nichols maintained an open door policy which allowed officers to speak to her directly. See Pl. Resp. L.R. 7.1(a)(3) Statement, ¶ 17.[17]  Therefore, Plaintiff's claims of gender based disparate treatment with regard to the terms and conditions of her employment are insufficient and must be dismissed.

## 2.  Termination

Plaintiff's claims of gender based disparate treatment with regard to her termination are also insufficient.  Although Plaintiff has supported the proposition that the Department allowed other officers to continue working after they had failed to complete the Police Academy within one year of their provisional appointment, one of the officers cited by Plaintiff for this proposition is Lori Mearz, a female.  Inasmuch as Plaintiff asserts that the Department made an exception for another female officer, a fact finder could not reasonably conclude that considerations of Plaintiff's gender motivated the termination decision.

Moreover, Plaintiff has failed to establish that she was treated in a disparate

---

[16](affirming summary judgment for employer where employee offered only her own general claim of discrimination to show that the employer's legitimate reason for terminating her was pretextual)

[17]In response to Defendants' Statement that "The plaintiff would violate the chain of command on a weekly basis and would burden the Chief with things that should have been taken to a Sergeant," Plaintiff responded in pertinent part: "DENY Plaintiff would violate any rules, regulations or policies of the Department on a weekly basis or that Chief was 'burdened'. Chief had informal relationship with most officers and Plaintiff would babysit her children and go to her home. Further, Chief Nichols encouraged direct communication with Plaintiff and gave her assignments directly."

fashion to a male probationary officer who was similarly situated to her in all material respects. See Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).  While Plaintiff compares herself with Officer Cox, a male probationary officer who also failed the agility test at the April 2008 Police Academy, it is undisputed that Cox was hired a week before the Police Academy.  Thus, unlike Plaintiff, Cox was not at the end of the one-year probationary period at the time he failed the Police Academy.[18]  Because Plaintiff has failed to provide sufficient evidence that considerations of gender motivated the employer's termination decision, the disparate treatment discharge claims are dismissed.

### f.   Retaliation- Title VII and Human Rights Law

When a court is presented with the task of analyzing a claim of employment retaliation, the claim is subject to the burden shifting analysis established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Gorzynski, 596 F.3d at 110.  To establish a *prima* claim for retaliation, Plaintiff must demonstrate that: (1) she engaged in protected activity, (2) the employer was aware of this activity, (3) the employer took adverse action against the plaintiff, and (4) a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action. Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010).

### 1.  Termination

According to Plaintiff, she complained of sexual harassment to Chief Nichols in February/March 2008.  Shortly thereafter, Plaintiff was reprimanded for "sabotaging" a

---

[18]Defendants assert that they feared the Village risked liability by employing a provisionally appointed officer for a year beyond her appointment without completion of the Police Academy.

fellow offer and, within a month, Nichols recommended that Plaintiff be discharged for failing to complete the Police Academy within one year of her provisional appointment as required by New York law.  Plaintiff has provided evidence that the employer made exceptions from these state law requirements for other officers.   Based upon these facts, a reasonable fact finder could conclude that (1)  considerations of Plaintiff's protected conduct motivated Chief Nichol's recommendation, and (2) a causal connection existed between the protected conduct and Nichols' recommendation that Plaintiff's employment be terminated.  This satisfies the elements of a *prima facie* retaliation claim.

Moreover, a question of fact exists as to whether the employer's articulated non-discriminatory reason for the discharge (*i.e.* that Plaintiff failed to complete the Police Academy within one year of her appointment) was the real reason for the discharge or merely a pretext for discrimination.  Inasmuch as the Village Board's discharge determination appears to have been based solely on Nichols' recommendation, and because evidence exists that Nichols made exceptions for other officers in somewhat similar circumstances, a jury could conclude that the discharge determination was motivated by Nichols' animus arising from Plaintiff's protected conduct.  Therefore, the motion on this ground is denied.

### 2.    Bassett Hospital Position

To establish a retaliation claim based on a negative employment reference, a plaintiff must first prove that a "*false* statement negatively affected [the plaintiff's] chances of securing employment." Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 79 (2d Cir.

2005) (emphasis in original); see id. at 178-79;[19] Abreu v. New York City Police Dept., 329

Fed. Appx. 296, 298, 2009 WL 835072, at * 1 (2d Cir. March 31, 2009);[20] see also

Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006);[21]

Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997);[22] Hashimoto v.

Dalton, 118 F.3d 671, 674 (9th Cir.1997);[23] Bascom v. Fried, 2008 U.S. Dist. LEXIS

25466, at *12 n. 3 (E.D.N.Y. Mar. 31, 2008).[24]  Although Chief Nichols refrained from

giving a reference to the Commercial Investigations LLC investigator or to Joe Middleton

when he first contacted her, Nichols purportedly said to Middleton during their second

conversation that "Jennifer is aware that her performance was not up to standards" and

_____

[19]The Second Circuit wrote in Jute:

> In order to recover on the negative job reference claim, Jute must first show that [the employer's] comment amounted to an adverse employment action. There exist "no bright-line rules" in this area, so that "courts must pore over each case to determine whether the challenged employment action reaches the level of adverse." Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997) (internal quotation marks omitted). In the context of this case, we hold that a reasonable jury, after hearing the defendant's evidence to the contrary, could find that [the employers's] *false* statement negatively affected Jute's chances of securing employment. See *EEOC Compliance Manual* § 8-II(D)(2) (May 20, 1998)(citing as possible example of post-employment retaliation "actions that are designed to interfere with the individual's prospects for employment"); cf. Pantchenko v. C.B. Dolge Co., 581 F.2d 1052, 1054 (2d Cir. 1978) (*per curiam*). The claim is therefore actionable.

Jute, 430 F.3d 178-79.

[20]("First, [plaintiff] cannot show that he suffered an adverse employment action, as he failed to prove that any of [his Lieutenant's] statements impacted his ability to secure subsequent work.")

[21](retaliation can be any type of materially adverse action that might dissuade a reasonable workers from making or supporting a charge of discrimination).

[22]( "[P]laintiffs may be able to state a claim for retaliation ... if ... the company ... sullies the plaintiffs reputation.") (internal citations omitted)

[23]( "[D]issemination of the negative job reference is an actionable employment decision.")

[24]("There is little question that the dissemination of adverse employment references can constitute a violation of Title VII if motivated by discriminatory intent.")(interior citations and quotation marks omitted).

23

that she would not hire Plaintiff.  Inasmuch as there is no dispute that Plaintiff did not fulfill the New York General Municipal Law § 209-q requirement of completing a police academy within one year of her provisional appointment, Nichol's statement is susceptible to the construction that she was referring to the state law standard when she said that Plaintiff's performance "was not up to standards."  In this regard, the statement was not false.  Moreover, Nichol's opinion that she would not hire Plaintiff does not, in itself, constitute a false statement.

However, a reasonable inference could be drawn that the "standard" to which Nichols referred was the more generalized Department work standard.  A reasonable inference could also be drawn that, based on Nichol's professed attempts to re-admit Plaintiff into the Police Academy and/or gain her admission into other academies, Plaintiff did meet the Department's work standard.  Thus, it is possible that a fact finder could conclude that Nichol's statement to Middleton was false and intended to interfere with Plaintiff's prospects of future employment.  See Brescia v. Sia, 2008 WL 1944010, at * 4, n. 3 (S.D.N.Y. April 30, 2008).[25]

Plaintiff must also establish a causal connection between the protected conduct and the adverse employment action, here the lost employment opportunity.  Abreu, 329 Fed. Appx. at 298.  Although somewhat tenuous, a reasonable fact finder could make this connection.  Despite Middleton's testimony that he made the decision not to hire Plaintiff before his second conversation with Nichols, the fact that his email to the Bassett Hospital

_____

[25] ("Although the court in Jute emphasized that the reference was not only negative but false, nothing in the opinion suggests that a factually accurate yet negative reference given in retaliation for protected activity would not support a claim. We are not aware of any authority that would impose that limitation.")

Human Resource Department directing them not to hire Plaintiff was sent after the second conversation with Nichols, a fact finder could conclude that Nichols' statement was the lynchpin of Middleton's decision.  A fact finder could also conclude that animus arising from Plaintiff's protected conduct was the reason Nichols decided to disregard the Village's "no comment" policy.  Accordingly, the motion in this regard is denied.

### g.   Section 1983 Claims

Plaintiff also asserts claims under 42 U.S.C. § 1983 arising from her employment. To state a cognizable Section 1983 claim, a plaintiff must allege a violation of rights secured by the Constitution or laws of the United States, and that such violation was committed by a person acting under the color of state law. Kern v. City of Rochester, Fire Department, 93 F.3d 38, 43 (2d Cir. 1996).  There is no dispute that the state action element is satisfied in this matter.

### 1.  Equal Protection

Plaintiff asserts that her rights secured by the Equal Protection Clause of the Fourteenth Amendment were violated by Defendants' actions of sexual harassment and disparate gender discrimination.  "The Equal Protection Clause, through § 1983, 'protect[s] public employees from various forms of discrimination, including hostile work environment and disparate treatment, on the basis of gender.  Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII, the difference being that a § 1983 claim, unlike a Title VII claim, can be brought against individuals.'" Edwards v. City of Kingston, 2010 WL 3761892, at * 8 (N.D.N.Y. Sept. 20, 2010)(quoting Demoret v. Zegarelli, 451

25

F.3d 140, 149 (2d Cir. 2006)).

As discussed above, the facts underlying Plaintiff's Title VII and Human Rights Law disparate treatment claims are insufficient to maintain the claims. For the same reasons, the § 1983 Equal Protection disparate treatment claims are dismissed.

Plaintiff may, however, maintain § 1983 sexual harassment claims against Defendant Fassett. Fassett is alleged to have perpetrated the sexual harassment which, if proven, would also establish his personal involvement for purposes of imposing § 1983 liability. See Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000).

Assuming, *arguendo,* that Plaintiff is able to establish that Fassett intentionally engaged in an ongoing course of sexual harassment, then Fassett would not be entitled to qualified immunity. The law was clearly established at the time that an individual had the constitutional right to be free from sexual harassment by a supervisor. See Demoret, 451 F.3d at 149; Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 130 (2d Cir. 2004). The existence of the factual questions as to what Defendant Fassett did while Plaintiff was employed prevents the Court for granting qualified immunity to Fassett at this time.

As to Chief Nichols, there exists no facts supporting her personal involvement in the asserted unconstitutional acts of Fassett. While a supervisor may be held liable under § 1983 on the theory that she was grossly negligent "in the supervision of [a] subordinate[] who committed the wrongful acts and fail[ed] to take action upon receiving information that constitutional violations [were] occurring," Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004), the facts here demonstrate that Nichols separated Plaintiff and

26

Fassett's shift within a day of being advised by Plaintiff of the alleged conduct even though Plaintiff told Nichols to do nothing. No reasonable fact finder could conclude that Nichols was grossly negligent in her supervision of Fassett.  Assuming, *arguendo*, that Nichols could be deemed to have been grossly negligent in supervising Fassett, she is entitled to qualified immunity on the claim.  It was objectively reasonable, under either scenario when Plaintiff reported Fassett's conduct, for Nichols to seprate the shifts of the two officers even in the face of Plaintiff's request that Nichols do nothing.  Accordingly, the § 1983 equal protection claim against Nichols is dismissed.

As against the municipality, Plaintiff "must show that the [constitutional violation] was the result of municipal custom, policy, or practice." Fitzgerald v. Barnstable Sch. Comm., --- U.S. ----, 129 S. Ct. 788, 797 (2009) (citing Monell v. Dep't of Social Servs. of City of N.Y., 436 U.S. 658, 694 (1978)).   Plaintiff asserts, in wholly conclusory fashion, that the Village is responsible under a theory of failure to train or supervise its employees, or on the grounds that Chief Nichols was the *de facto* policy maker and caused the constitutional deprivation by overriding the Village's sexual harassment policy. See Pl. MOL p. 25.   Both theories are inadequate to sustain the Monell claims.

"A municipality's failure to train or supervise its officers can rise to the level of an actionable policy or custom where it amounts to 'deliberate indifference' to the constitutional rights of its citizens."  Hall v. Marshall, 479 F. Supp.2d 304, 315-16 (E.D.N.Y.2007) (citations omitted).  "As the phrase 'deliberate indifference' suggests, a plaintiff cannot prevail [on a failure to supervise theory] merely upon proving a failure to investigate or rectify the situation; she must demonstrate that such failure 'evidences

27

deliberate indifference, rather than mere negligence or bureaucratic inaction.'" <u>Stevens v. City of Bridgeport</u>, 607 F. Supp.2d 342, 356 (D. Conn. 2009)(quoting <u>Amnesty Am. v. Town of West Hartford</u>, 361 F.3d 113, 128 (2d Cir. 2004)).  On such a theory, "[p]laintiffs must also prove causation; that is, that the 'state defendants' inadequate supervision actually caused or was the moving force behind the alleged violations.'" <u>Id.</u> (quoting <u>Reynolds v. Giuliani</u>, 506 F.3d 183, 193 (2d Cir. 2007)).

On a failure to train theory,

> [a] plaintiff must meet [<u>Walker v. City of New York</u>, 974 F.2d 293 (2d Cir.1992)]'s three-pronged test to demonstrate deliberate indifference, and ordinarily establishes deliberate indifference by showing "that the officials consciously disregarded a risk of future violations of clearly established constitutional rights by badly trained employees." <u>Amnesty Am.</u>, 361 F.3d at 127 n. 8 (citing <u>City of Canton</u>, 489 U.S. at 389-90, 109 S. Ct. 1197). To prevail, a plaintiff must also prove causation; that is, a plaintiff must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." <u>Id.</u> at 129 (citation and internal quotation marks omitted).  Demonstrating "negligent administration of a sound program," or that one or more officers negligently or intentionally disregarded otherwise appropriate training, does not suffice. <u>Id.</u> at 129-30.

> To survive summary judgment on a failure to train claim, a plaintiff must introduce "evidence as to the city's training program and the way in which that program contributed to the violation." <u>Amnesty Am.</u>, 361 F.3d at 127 n. 8.  Ordinarily, a plaintiff should introduce evidence of "how the training was conducted, how better or different training could have prevented the challenged conduct, or how 'a hypothetically well-trained officer would have acted'" differently under the circumstances. <u>Id.</u> at 130.

<u>Stevens</u>, 607 F. Supp.2d at 357-58.

Plaintiff points to insufficient evidence "of a pattern of misconduct by [the municipal employer] that might support a circumstantial case for a policy or practice" of failing to properly train or supervise its officers, and the Court declines to search the record for

28

such evidence. See Sulehria v. City of New York,  670 F. Supp.2d 288, 321 (S.D.N.Y.

2009).[26]  Moreover, according to Plaintiff's Rule 50(h) testimony, when she first reported

to Nichols the inappropriate conduct by Fassett, she told Nichols that she would handle

the situation herself.  It is hardly evidence of deliberate indifference that Nichols complied

with Plaintiff's request.  Further, under both scenarios when Plaintiff reported Fassett's

sex-based statements to Nichols, Nichols separated Plaintiff and Fassett while at work.

Again, this does not evince Nichols' deliberate indifference to Plaintiff's complaint,

especially in light of Plaintiff's direction to Nichols to do nothing.  Moreover,  there is no

evidence that any further sexually harassing conduct by Fassett occurred after Nichols

separated the two the day after the 2-hour walk.

To the extent that Nichols' testimony regarding Plaintiff's report of sexual

harassment (i.e. related to the shirt incident) is uncontradicted, the evidence is such that

Nichols reported the event to the Personnel Director, conducted an investigation,

separated Plaintiff and Fassett, and advised Fassett not to engage in similar conduct.  No

reasonable fact finder could conclude that this conduct constituted deliberate indifference

to Plaintiff's constitutional right to be free from gender-based sexual harassment in the

---

[26]In addressing a similar conclusory response to a motion for summary judgment, the Southern
District wrote:

> The Second Circuit has observed, "Federal Rule of Civil Procedure 56 does not impose an
> obligation on the court considering a motion for summary judgment to perform an
> independent review of the record to find proof of a factual dispute." In re Agent Orange
> Prod. Liab. Litig., 517 F.3d 76, 92 n. 14 (2d Cir. 2008) (quoting Amnesty Am. v. Town of
> West Hartford, 288 F.3d 467, 470 (2d Cir.2002)). Since plaintiff has not pointed to any
> evidence supportive of this claim, he has not carried his burden, and summary judgment is
> appropriate on this claim.

Sulehria,  670 F. Supp.2d at 321-22.

workplace.

Thus, there is insufficient evidence to support the theory that the Village maintained a policy of deliberate indifference in the way it supervised or trained its officers with regard to workplace sexual harassment complaints, or that, if such a policy existed, that it caused Plaintiff's constitutional deprivation.

Plaintiff has also failed to establish that the Village is responsible for Fassett's acts of sexual harassment under the theory that Chief Nichols was the Village's *de facto* policy maker for sexual harassment issues in the workplace.  A single act by a municipality may amount to municipal policy "if ordered by a person 'whose edicts or acts may fairly be said to represent official policy.'" Rookard v. Health and Hospitals Corp., 710 F.2d 41, 45 (2d Cir.1983) (quoting Monell, 436 U.S. at 694); see Jeffes v. Barnes, 208 F. 3d 49, 57 (2d Cir. 2000).[27]  "Where the contention is not that the actions complained of were taken pursuant to a local policy that was formally adopted or ratified but rather that they were taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved." Jeffes, 208 F. 3d at 57.   However, "merely asserting that an official has 'discretion in the exercise of particular functions' is not sufficient to impose municipal liability."  Peterson v. Tomaselli, 2004 WL 2211651, at * 9 (S.D.N.Y. Sept. 30, 2004). "Moreover, even if a municipal employee is considered a 'policy maker,' that employee 'must be responsible for establishing final government policy respecting the particular

_____

[27](A custom or policy may be shown by a final policymaker committing or commanding the complained-of constitutional violation.)

activity before the municipality can be liable.'" Wood v. Town of East Hampton, 2010 WL 3924847, at * 25 (E.D.N.Y. Sept. 30, 2010)(quoting Birmingham v. Ogden, 70 F. Supp.2d 353, 374 (S.D.N.Y. 1999)).

Plaintiff's mere assertions that Chief Nichols is the Village's "policy maker" for purposes of workplace sexual harassment complaints is insufficient for liability to attach to the Village under Monell. Id.  Even assuming, *arguendo*, that Nichols could be considered the *de facto* policy maker for sexual harassment issues in the workplace, the evidence is insufficient to establish that Nichols committed or commanded the complained-of constitutional violation, or that she instituted some policy that allowed the conduct to occur or continue.  When first confronted with the contention that Fassett was engaging in inappropriate conduct, Nichols separated Plaintiff and Fassett even though Plaintiff told Nichols to do nothing.  Moreover, there is no evidence that Nichols prevented Plaintiff from (1) filing a formal written complaint in compliance with the sexual harassment policy, or (2) contacting the Village's Personnel and Finance Committee to report the conduct. Plaintiff has not presented facts from which a reasonable fact finder could conclude that Chief Nichols was the *de facto* policy maker for sexual harassment complaints, or, if she was, that she instituted any policy that allowed the sexual harassment to occur. Accordingly, the Equal Protection Monell claim is dismissed.

### 2.  First Amendment

Plaintiff's First Amendment retaliation claim is deficient and must also be dismissed.  A public employee who makes a First Amendment claim of employment retaliation pursuant to §1983 must show that: (1) the plaintiff engaged in protected

speech; (2) she suffered an adverse employment decision, and (3) there is a causal connection between her speech and that adverse employment decision, so that it can be said that the plaintiff's speech was a motivating factor in the adverse employment action. See Garzetta v. Caballus, 547 U.S. 410, 418 (2006); Cioffi v. Averill Park Central School Dist. Board of Ed., 444 F.3d 158, 162 (2d Cir. 2006).  A public employee's speech may be constitutionally protected only if the plaintiff has spoken out as a citizen, not as an employee, on matters of public concern, rather than on matters of personal interest, and the state lacks an adequate justification for treating the employee differently from any other member of the general public.  See Garzetta, 547 U.S. 410; Pickering v. Board of Educ., 391 U.S. 563, 568 (1968); Cotarelo v. Sleepy Hollow Police Dept., 460 F.3d 247, 252 (2d Cir. 2006); Grillo v. New York City Transit Authority, 291 F.3d 231, 235 (2d Cir. 2002); Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999).

"Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record." Lewis v. Cowen, 165 F.3d 154, 163 (2d Cir. 1999).  "If the court determines that the plaintiff either did not speak as a citizen or did not speak on a matter of public concern, 'the employee has no First Amendment cause of action based on his or her employer's reaction to the speech' . . . ." Sousa v. Roque, 578 F.3d 164, 170 (2d Cir. 2009) (quoting Garzetta, 547 U.S. at 418).  "The heart of the matter is whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'" Ruotolo v. City of New York, 514 F.3d 184, 189 (2d Cir. 2008) (quoting Lewis v. Cowen, 165 F.3d 154, 63-64 (2d Cir. 1999)).

Here, Plaintiff's speech was limited to her personal grievances about the way she was treated at the Department, and does not address a broader public purpose. Therefore, the First Amendment retaliation claim is dismissed.

### 3.  Due Process

In the Tenth Cause of Action, Plaintiff alleges a deprivation of "her good name and reputation without due process of law in violation of the Fourteenth Amendment to the United States Constitution."  Compl. ¶ 46.  She asserts that Chief Nichols' "untrue" statement to Joe Middleton that her performance "was not to standards" stigmatized her and harmed her ability to secure alternative employment. See Pl. MOL, p. 23; Comp. ¶¶ 41-46.

"Damage to an employee's reputation brought about by an employer's stigmatizing comments standing alone . . . is a matter properly vindicated under state tort law, and does not rise to a deprivation of a constitutional right." Morris v. Lindau, 196 F.3d 102, 114 (2d Cir. 1999) (citing Paul v. Davis, 424 U.S. 693, 701 (1976); Donato v. Plainview-Old Bethpage Cent. Sch. Dist., 96 F.3d 623, 630 (2d Cir.1996)); see also Patterson v. City of Utica, 370 F.3d 322, 329-30 (2d Cir. 2004).[28]  "When the government's defamation is coupled with the loss of a non-reputational liberty or property interest without due process of law, however, it may be actionable under the Fourteenth Amendment."  Spang v. Katonah-Lewisboro Union Free School Dist., 626 F. Supp.2d 389, 394-95 (S.D.N.Y. 2009).

---

[28](A "person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983.")

33

To establish a deprivation of a liberty interest based upon defamation, Plaintiff must show a "stigma plus," which is typically defined as "a loss of reputation 'coupled with some other tangible element.'" Morris, 196 F.3d at 114 (quoting Valmonte v. Bane, 18 F.3d 992, 999 (2d Cir.1994)).  Where the defamation occurs following a plaintiff's loss of public employment, the plaintiff

> must show (1) a stigmatizing statement that calls into question [her] good name, reputation, honor, or integrity, or denigrates her competence as a professional and impugned [her] . . . professional reputation in such a fashion as to effectively put a significant roadblock in [her] continued ability to practice ... her profession,  (2) the public dissemination of the stigmatizing statement, and (3) that the stigmatizing statements were made concurrently with, or in close temporal relationship to, the plaintiff's dismissal from government employment.

St. Louis v. New York City Health and Hosp. Corp., 682 F. Supp.2d 216, 238 (E.D.N.Y. Feb. 1, 2010)(interior quotation marks and citations omitted).

The publication and proximity prongs are satisfied here by Chief's Nichols' statement to Joe Middleton.  However, "[w]hen the stigma theory is based on denigration of the employee's professional competence, the plaintiff must also show foreclosure of future business opportunities." Spang, 626 F. Supp.2d at 395.  The statement that Plaintiff did not perform "to standards," even if false, does not satisfy the stigma requirement of a stigma-plus claim.  The statement does not denigrate Plaintiff's competence as a professional law enforcement officer or impugn Plaintiff's professional reputation "in such a fashion as to effectively put a significant roadblock in [Plaintiff's] continued ability to practice . . . her profession." Donato, 96 F.3d at 630-31.  Plaintiff has not alleged that the statement impacted her ability to obtain any other employment in the field of law enforcement and, in fact, she attests that "[a]fter I was denied the job at Bassett, I applied

34

and was hired at the Sheriff's Department."  Gilbert Aff. ¶ 19.  Accordingly, Plaintiff's Due Process claim is dismissed.

### h.    Cross-Motion to Amend Complaint

Plaintiff moves to amend the Complaint at ¶ 20(G) to include the allegation that Nichols told Middleton in July 2008 that Plaintiff should not be hired at Bassett Hospital "since her performance at the Village Police Department was 'not to standards.'"  Because Plaintiff still has a state law defamation claim pending in this matter, the proposed amendment would not be futile.  Further, Defendants were on notice of Nichols' purported statement since they conducted the deposition of Stephanie Hobbie on June 16, 2010, so there exists no prejudice to Defendants by the late amendment.  Accordingly, the motion to amend is granted.

## V.  CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment [dkt. # 35] is **GRANTED IN PART AND DENIED IN PART**.  The motion is granted inasmuch as the following claims are **DISMISSED**:

1.    All claims against the Village of Cooperstown Police Department;

2.    All Title VII claims against Defendants Diana Nichols and Sgt. Fassett;

3.    All claims against the "Doe" defendants;

4.    Plaintiff's Title VII and NY Human Rights Law sexual harassment/hostile work environment claims against the Village of Cooperstown;

5.    Plaintiff's Title VII and NY Human Rights Law claims of gender based disparate treatment against all defendants;

6.      Plaintiff's § 1983 Equal Protection disparate treatment claims against all defendants;

7.      Plaintiff's § 1983 Equal Protection sexual harassment claims against Defendants Diana Nichols and the Village of Cooperstown;

8.      Plaintiff's § 1983 First Amendment retaliation claim against all defendants;

9.      Plaintiff's § 1983 Due Process claim against all defendants.

The motion is **denied in all other respects**.

Plaintiff's cross-motion to amend her Complaint [dkt. # 38] is **GRANTED,** and Plaintiff shall file and serve the proposed amended complaint within twenty (20) days of the date of this Decision and Order.

**IT IS SO ORDERED**

DATED:   February 25, 2011


Thomas J. McAvoy
Senior, U.S. District Judge